FILED
APR 3 2006

United States Bankruptcy Court
Columbia, South Carolina (SD)

ENTERED
APR 3 2006
K.R.W.

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| IN RE: | ) | Chapter 11 |
| | ) | |
| Barefoot Resort Yacht Club Villas, LLC, | ) | Case No.  06-00640-jw |
| | ) | |
| Debtor. | ) | |

## AMENDED[1] ORDER (1) OVERRULING AND DENYING PREMIER'S OBJECTIONS TO ASSET SALES; (2) OVERRULING AND DENYING PREMIER'S PREEMPTIVE OBJECTION TO DEBTOR'S REJECTION OF THE CONTRACT OF SALE; AND (3) DENYING PREMIER'S CONDITIONAL MOTION TO DISMISS DEBTOR'S BANKRUPTCY CASE PURSUANT TO 11 U.S.C. §1112(b)

THIS MATTER comes before the Court on motion of Barefoot Resort Yacht Club Villas, LLC ("Debtor") assuming certain executory contract and authorizing the sale of certain condominium units free and clear of liens ("Second Sales Motion"). Premier Resorts International, Inc. ("Premier International"), Premier Holdings, LLC ("Premier Holdings"), and Premier Holdings of South Carolina, LLC ("Premier of S.C.") (collectively referred to herein as "Premier") objected to the Second Sales Motion on March 6, 2006 in a single pleading captioned as "(1) Objection to Asset Sales; (2) Motion Under 11 U.S.C. §365(d)(2) for an Order Directing Debtor to Assume or Reject the Premier Contract Before Closing Any Further Asset Sales; (3) Conditional Objection to Any Further Asset Sales Pending Debtor's Election; (4) Preemptive Objection to Debtor's Rejection of the Premier Contract; and (5) Conditional Motion to Dismiss This Bankruptcy Case Under 11 U.S.C. §1112(b)" (referred to herein as the "Motion/Objection"). In its Motion/Objection,[2] Premier seeks the following relief:

---

[1] This order has been amended to correct a scrivener's error on page 12 to provide that "[t]he Court **does not** interpret the verb 'operate' to mean 'convey' and there is no provision of the Contract of Sale requiring commercial units to be transferred to Premier."

[2] For reasons stated herein, the Court questions the authority and standing of Premier of S.C. to appear and raise the various objections and motions filed by the Premier entities.

(1) a prohibition on further asset sales until Debtor files a master deed that contains all of Premier's requested modifications;

(2) an Order directing Debtor to assume or reject the December 18, 2003 Contract of Sale (the "Contract of Sale") before closing any further asset sales, alleging that such decision is necessary before creditors can decide whether to support those sales;[3]

(3) a prohibition on any further asset sales until Debtor makes that election;

(4) a preemptive objection to Debtor's rejection of Premier's contract on the grounds that rejection would render this solvent Debtor insolvent; and

(5) dismissal under 11 U.S.C. § 1112 of Debtor's bankruptcy if Debtor does not immediately assume the Contact of Sale.

Responses to Premier's objections and Objections to Premier's Motions were filed by Debtor and its secured construction lender, The National Bank of South Carolina ("NBSC"). Based upon the record and the evidence presented, the Court hereby makes the following findings of fact and conclusions of law:[4]

## FINDINGS OF FACT

1.      Debtor is a South Carolina Limited Liability Company that owns three buildings (Buildings 1, 2, and 3), which contain 145 residential condominium units known as Barefoot Resort Yacht Club Villas (the "Villas") and are located on the Intercoastal Waterway in Myrtle Beach, South Carolina.  Debtor is primarily in the business of developing and selling the Villas condominiums.

---

[3]  Premier's Motion to Compel Assumption or Rejection is under advisement.
[4]  The Court notes that, to the extent any of the following Findings of Fact constitute Conclusions of Law, they are adopted as such, and to the extent any Conclusions of Law constitute Findings of Fact, they are so adopted.

2.     Drake Development Company USA is an entity controlled by W. Russell Drake ("Drake") and is the sole member of Debtor.

3.     Barefoot JV, LLC ("Barefoot JV") is an entity controlled by Drake.

4.     Premier of S.C. is a joint venture jointly owned and controlled by Premier Holdings and Barefoot JV, LLC.

5.     Premier Holdings is an entity controlled by Bradley T. Goulding ("Goulding") and others.

6.     Premier International is also an entity controlled by Goulding and others, which appears to assert certain rights as a third-party beneficiary to the Contract of Sale.

7.     Drake and Goulding are the two managing members of Premier of S.C. Drake is the manager appointed by Barefoot JV and Goulding is the manager appointed by Premier Holdings.

8.     On December 18, 2003, Debtor entered into the Contact of Sale with Premier of S.C., whereby Premier of S.C. sold Debtor a tract of land on the Intercoastal Waterway in Myrtle Beach, South Carolina, where the Villas have subsequently been constructed.

9.     A provision in the Contract of Sale requires Debtor to split with Premier the Net Cash Flow remaining after all fees and expenses relating to the development of the Villas property and sale of the Villas condominium units. The Contract of Sale requires that the split of the Net Cash Flow be memorialized by way of a contingent interest note.

10.     Coastal Federal Bank ("Coastal Federal") was a real property lender for Premier of S.C. which subordinated its interest to the extent of $540,000 of the purchase price of the

3

Villas property in order to facilitate the sale of the Villas property from Premier of S.C. to Debtor.

11.   NBSC is the construction lender for the Villas project, and Debtor has borrowed in excess of $48 million from NBSC. NBSC is also the first lienholder on all of Debtor's assets and has received an assignment of the sales contracts for the Villas condominium units.

12.   Coastal Federal has subordinated its lien position to that of NBSC and is the second priority lienholder on the assets of Debtor pursuant to certain Intercreditor Agreements between Debtor, NBSC, Coastal Federal and Premier of S.C. (the "Intercreditor Agreements").

13.   Premier of S.C. has subordinated any claims it may have against Debtor to those of NBSC pursuant to the Intercreditor Agreements.

14.   Premier of S.C. sold and deeded the Villas property to Debtor, and, pursuant to the terms of the Contract of Sale, Debtor pre-sold all of the condominium units expected to be built at the Villas. Premier of S.C. and NBSC supported and required the pre-sale process.

15.   Construction of the three buildings at the Villas property, and the 145 residential condominium units therein, is nearing completion.

16.   In January, 2006, Premier of S.C., Premier Holdings, and Premier International filed a Lis Pendens on the Villas property.

17.   The decision of Premier of S.C. to file the Lis Pendens was unilaterally made by Goulding without the consent of or notice to Drake.

18.   The Lis Pendens made it impossible for Debtor to honor its 145 contracts for the sale of the condominium units at the Villas, to repay the NBSC debt, to pay the contractor in

4

order to complete construction of the Villas, to pay other creditors, and to create the Net Cash

Flow that was to be split between Debtor and Premier of S.C.

19.    On February 21, 2006, Debtor filed its voluntary petition for relief under Chapter

11 of the Bankruptcy Code. Debtor is operating its business and managing its assets as a debtor

in possession pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code. On February 24, 2006

the Court entered an Order Designating Debtor's Bankruptcy as a "Complex Case" pursuant to

local rules.

20.    Pre-petition, Debtor entered into contracts with various third parties to sell all 145

condominium units at the Villas.  All condominium unit purchasers were approved by their

respective lenders.  The gross aggregate sale proceeds for all 145 sales will exceed $62,000,000.

The total undisputed claims against Debtor, which do not include the disputed Premier claims,

are approximately $57,000,000. All purchasers have submitted a ten percent (10%) deposit. Said

deposits on the 145 condominium units at the Villas total an approximate $6,000,000 and are

being held by NBSC.

21.    Debtor filed its first Amended Motion for an Order Authorizing Debtor's

Assumption of Executory Sales Contracts, The Filing of a Master Deed, and The Sale of Assets

of Debtor Free and Clear of Liens, Claims, Encumbrances, and Other Interests Pursuant to 11

U.S.C. §363 (the "First Sales Motion") on February 22, 2006.

22.    Pursuant to an expedited hearing on February 24, 2006, the Court entered its order

approving the First Sales Motion on February 28, 2006 (the "First Sales Order"), which also

contained certain protections for rights alleged by Premier.

23.    Pursuant to the First Sales Motion and the First Sales Order, Debtor assumed eight sales contracts, had the Master Deed recorded, and closed on the sales of its first eight (8) condominiums free and clear of all liens, claims, encumbrances, and other interests, and free and clear of the Premier Lis Pendens.  As a result of the first eight (8) sales, NBSC received sales proceeds in excess of $3 million.

24.    On March 1, 2006, Debtor filed its Second Sales Motion which requested Court authorization of Debtor's assumption of sixty-three (63) of the contracts of sale and authorization to sell the sixty-three (63) condominium units free and clear of liens, claims, encumbrances, and other interests.  Pursuant to its ruling in an expedited hearing beginning on March 13, 2006 and lasting until March 15, 2006 on the Second Sales Motion, the Court entered is Second Order Authorizing (1) Debtor's Assumption of Executory Sales Contracts and (2) The Sale of Assets of Debtor Free and Clear of Liens, Claims, Encumbrances, and Other Interests Pursuant to 11 U.S.C. §363 on March 16, 2006 (the "Second Sales Order").

25.    Also on March 1, 2006, Debtor filed its Third Sales Motion which requests Court authorization of Debtor's assumption of the contracts of sale and to sell, free and clear of liens, claims, encumbrances, and other interests, the thirty-nine (39) remaining condominium units in Debtor's Building 2 at the Villas.  Pursuant to its ruling in an expedited hearing on the Third Sales Motion on March 20, 2006, the Court entered is Third Order Authorizing (1) Debtor's Assumption of Executory Sales Contracts and (2) The Sale of Assets of Debtor Free and Clear of Liens, Claims, Encumbrances, and Other Interests Pursuant to 11 U.S.C. §363 on March 20, 2006 (the "Third Sales Order").

26.    On March 3, 2006, Debtor filed its Fourth (and last) Sales Motion which requests

6

Court authorization of Debtor's assumption of contracts of sale and to sell, free and clear of

liens, claims, encumbrances, and other interests, the thirty-five (35) condominium units in

Debtor's Building 3. A hearing on the Fourth Sales Motion has been scheduled for and will be

heard on April 4, 2006 at 10:30 a.m.

## CONCLUSIONS OF LAW

The dispute between Debtor and Premier is the result of a stalemate in the control and

operations of Premier of S.C. This stalemate has occurred because of disputes between Drake

and Goulding in light of the equal standing of the two as co-managers of Premier of S.C.

Premier of S.C. is not in bankruptcy and its affairs are not, *per se*, before this Court. The dispute

at issue does not involve whether Drake or Goulding controls Premier of S.C.; however, the

stalemate between Premier of S.C.'s co-managers members is important in several respects.

The stalemate appears to have resulted in Goulding and Premier filing the Lis Pendens

pre-petition. This action jeopardized Debtor's scheduled closings with the third parties who

agreed to purchase the condominiums and thereby threatened Debtor's Net Cash Flow. The

filing of the Lis Pendens also disrupted the completion of construction at the Villas and

potentially placed Premier of S.C. in the position of violating the Intercreditor Agreement

between the parties, which may have caused Debtor to default under the terms of its lending

agreement with NBSC.

A second aspect of the Premier of S.C. stalemate is that the Contract of Sale, which

governs many of the issues raised by the parties, is a contract between Premier of S.C. and

Debtor. Premier International and Premier Holdings are not parties to the Contract of Sale. The

Court must therefore consider the authority and standing of Premier of S.C. to appear and raise

the contract concerns.   No convincing evidence has been presented to the Court that either managing member is entitled to unilaterally direct the actions of Premier of S.C., and as such, it appears to the Court that the present objections and motions, which purport to be filed on behalf of Premier of S.C., may be unauthorized.

There were two objections filed by Premier to the sales.   First, Premier objected to any further asset sales based on the Master Deed as it was recorded.   Second, Premier objected to any further asset sales until Debtor assumes or rejects the December 18, 2003 Contract of Sale.   In addition to the two objections, Premier filed a Motion to Compel Assumption or Rejection of the Contract of Sale, a Preemptive Objection to the rejection of the Contract of Sale, and a Motion to Dismiss Debtor's bankruptcy case for "bad faith."   In order to make final determinations as to Premier's Motions and Objections and to allow the sales to go forward, the Court must first make certain determinations on some of the issues relating to the underlying Contract of Sale. Without making a final determination as to the standing of the Premier entities to raise the various objections or to make the various motions, the Court concludes as follows:

## I.      The Contract of Sale Issues

As a preliminarily matter, based on the evidence and record before the Court, Premier's assertion of a breach of contract appears to result in a claim for damages and the Court believes that monetary damages would be the proper remedy for any breach of the Contract of Sale, if proven.

Three primary areas of dispute between Premier and Debtor have been identified in the Contract of Sale.   The first area of dispute relates to the requirement of Debtor to enter into a contingent interest note giving Premier of S.C. an interest in Debtor's Net Cash Flow remaining

8

after paying all costs. The second area of dispute relates to the creation and ownership of certain "commercial units" at the Villas. The third area of dispute relates to whether Premier International is entitled to the initial Homeowners Association management contract for the condominiums at the Villas.

### A.    Contingent Interest Note

Debtor and Premier agree that the Contract of Sale requires Debtor to enter into a contingent interest note giving Premier of S.C. a 50% interest in the Net Cash Flow remaining after paying all costs associated with the cost of the phase, including, but not limited to, taxes, construction loan cost and interest, equity loan cost and interest, closing cost and attorney fees, real estate commissions, construction, architectural and engineering fees and cost and discounts or incentives. At issue is the form of the note. The Court believes that its First Sales Order, Second Sales Order, and Third Sales Order (collectively, the "Sales Orders"), all of which require the Net Cash Flow to be held in escrow pending final determination of this issue, are adequate to protect the interests of the parties. However, the Court will enter a separate order that requires the making of a contingent interest note. The contingent interest note or the order shall contain language stating that the payments under the contingent interest note are subject to further final orders of this Court as to the amount of allocation due Premier of S.C. or its assigns after this Court determines the amounts of offsets against the note, if any.

### B.    Commercial Units

Premier has asserted that the Contract of Sale requires Debtor to create certain "commercial units" in the buildings at the Villas and to convey ownership of the commercial units to Premier International. The creation of the commercial units was previously addressed by

9

the Court's First Sales Order, which required Debtor to include certain language in the recorded

Master Deed creating such commercial units. The Sales Orders have protected any alleged

Premier interest in such commercial units by prohibiting Debtor from conveying the commercial

units except upon further order of this Court. That language having been included in the Sales

Orders, the crux of the issue before the Court is whether the terms of the Contract of Sale require

the commercial units to be conveyed to Premier International.

Generally, if the terms of a contract are clear and unambiguous, this Court must enforce

the contract according to its terms regardless of its wisdom or folly. Southern Atlantic Financial

Services, Inc. v. Middleton, 356 S.C. 444, 447, 590 S.E.2d 27, 29 (2003) (citing to Ellis v.

Taylor, 316 S.C. 245, 449 S.E.2d 487 (1994)).  Ambiguous language in a contract, however,

should be construed liberally and interpreted strongly in favor of the non-drafting party.

Southern Atlantic Financial Services, Inc., 356 S.C. at 447, 590 S.E.2d at 29 (citing to Myrtle

Beach Lumber Co., Inc. v. Willoughby, 276 S.C. 3, 274 S.E.2d 423 (1981)).  The Contract of

Sale is unambiguous. To the extent that there are ambiguities in the Contract of Sale, the Court

would not construe these ambiguities against Premier or Debtor because Contract of Sale was

drafted by an attorney who represented the interest of both parties at the time the Contract was

drafted.

Premier's contention that the commercial units should have been conveyed to Premier

International is based on the language of the Contract of Sale that states Premier will "operate"

the commercial units. Premier based its assertion to ownership of the commercial units upon the

word "operate" in the following recital paragraph in the Contract of Sale:

> The design, service facilities and furnishings of the buildings shall be approved
> jointly by Seller and Purchaser in their reasonable discretion, it being Seller's

10

and Purchaser's intent that Premier Resorts International, Inc. shall manage the
Resort Tract buildings and *operate* the Commercial Units in the buildings
which management and operation shall rise to a level of service as agreed by
Seller and Purchaser.

Contract of Sale, p.2 (emphasis added).

At the hearing on this matter, Goulding testified that the ". . . operate the Commercial
Units . . ." language in this paragraph meant that the units must be conveyed to Premier
International. The Court does not interpret the verb "operate" to mean "convey" and there is no
provision of the Contract of Sale requiring commercial units to be transferred to Premier.

Premier also argued that because it was deeded the commercial units by another Drake
entity at the North Tower, a building adjacent to the Villas that was not owned, constructed nor
developed by Debtor and that the same should also occur with regard to the commercial units in
the Villas. The Contract of Sale is unambiguous, and the relationship between Debtor and
Premier should be governed by the terms in the Contract of Sale. The relationship that any of the
parties may have at the North Tower does not control this matter and does not weigh into this
Court's determination. For the foregoing reasons, the Court hereby determines that the
commercial units at Debtor's Villas project are not required to be conveyed to any of the Premier
entities.

### C.    Management Contract

Premier asserted that the Contract of Sale required Debtor to enter into a management
contract with Premier International and further asserted that both parties manifested their
intention to do so by the execution of the Contract of Sale. In support of this assertion, Premier
pointed to the unnumbered recital paragraph quoted above. The Court notes that "it is standard
contract law that a 'Whereas clause,' while sometimes useful as an aid to interpretation, cannot

11

create any right beyond those arising from the operative terms of the document." Grynberg v. FERC, 71 F.3d 413, 416 (D.C.Cir. 1995). In addition, the Court is not convinced that managing "Resort Tract buildings" as set out in this unnumbered recital paragraph is the same as managing a Homeowners Association, and the Court finds that such is not required by this paragraph.

Even more convincing is the fact that the sentence at issue also contains unambiguous language which indicates, ". . . which management and operation shall rise to a level of service as agreed by Seller and Purchaser." The plain meaning of this language is that Seller and Purchaser may agree to what degree Premier International would manage any facilities at the project. There is no evidence before this Court that there was ever such an agreement between the parties.

Premier also pointed to Paragraph 45 of the Contract of Sale, which reads:

> 45. Management Agreement. Purchaser and Premier Resorts International, Inc., will prior to Closing of Parcel 3, enter into an agreement with respect to the management of units and Yacht Club. Seller acknowledges and will disclose to Premier Resorts International, Inc. that the Owners of the Units decide who will lease their units and who will manage the condominium association and the Non-Residential Association. Seller further acknowledges that there shall not be any rental pools of the units in the buildings which would subject the Project to the jurisdiction of any State or Federal securities regulators and agrees that Seller and Premier Resorts International, Inc. will not engage in any activity which would cause the sale of the condominiums in the Project or the Memberships to be subject to South Carolina or Federal Securities laws. Seller and Premier Resorts International, Inc shall hold Purchaser and Construction Lender harmless from any violation by them of South Carolina or Federal Securities laws on any South Carolina Real Estate Commission rules and regulations. This agreement shall survive the Closing.

Contract of Sale, ¶ 45, p.17.

The first sentence of Paragraph 45 represents an agreement to agree in the future. At the hearing in this matter, Goulding testified that he never caused a management agreement to be

12

prepared prior to the closing. Paragraph 45 indicates a specific time frame in which that agreement should be entered, ". . . prior to the closing date . . . ." The closing occurred in 2004. The parties did not enter into any such management agreement at or before the closing. Furthermore, the duration and the terms of any management agreement are not spelled out in the Contract of Sale. It would be mere speculation by this Court or any party to indicate the type, term, or breadth of any such management agreement.

Furthermore, it appears that the management provision of Paragraph 45 may have been waived since it was not entered into prior to closing as required by the Contract of Sale. The Court recognizes that at the end of Paragraph 45, there is a sentence referring to the survival of an agreement beyond closing, but the Court finds that the normal reading of the Paragraph would indicate that such sentence refers to the hold harmless agreement of the parties in the immediately preceding sentence.

Even if this Court were to apply this provision of the Contract of Sale in the way Premier asserts, it does not refer to the management of the Homeowner's Association (the "HOA"). The clear, broad, and unambiguous language of the paragraph further indicates that it is the owners of the Villas condominium units who are to decide who will manage their units, lease their units, and manage the condominium association and any non-residential association.

As a practical matter, viewing this project on the eve of the conveyance of all the units, it appears to the Court that the owners of the units clearly, under law, and under the unambiguous language of the Contract of Sale have the right to decide who manages their units. The unit owners may make changes that would effectively trump any ability of Debtor to control who the managing entity is for the rental of units or the HOA.

13

Based upon the foregoing, the Court finds that the Contract of Sale does not give, nor does it require Debtor to give, Premier International, or any of the Premier entities, an initial Homeowners Association management contract or any type of rental or leasing contract.

## Damages

Premier's alleged damages resulting from Debtor's refusal to give Premier International the initial HOA management contract are not viable in light of the foregoing finding. At the hearing on this matter, Premier alleged that it would suffer $1,713,516 in damages as a result of Debtor refusing to give Premier International the initial HOA management contract. Premier further alleged in excess of $42,008,953 in present value damages as a result of lost rental management contracts, which Premier contended it would obtain if Premier International were given the initial HOA management contract. Premier's calculations included damages relating to dues to be received in the future from unknown homeowners on unsold units in unbuilt towers not even owned by Debtor. Premier's calculations of damages include amounts relating to projects set out in the Contract of Sale that were not contemplated to be undertaken by Debtor.

Paragraph 36 of the Contract of Sale provides, in relevant part as follows:

> 36. <u>Default Provisions</u>. If the sale of each Parcel as contemplated by this Contract is not consummated on or before the Closing Date for that Parcel because of Purchaser's failure or refusal to close hereunder for any reasons other than the default of Seller, Seller's sole and exclusive remedy shall be to terminate the Contract, to retain the Earnest Money and to retain copies of the development and sales material of Purchaser concerning the Project as liquidated damages. If the Purchaser otherwise fails to perform Purchaser's obligations under this Contract, then Purchaser shall be in default and Seller's sole and exclusive remedy shall be to terminate this Contract and recover its cost and attorney fees incurred to the date of termination or incurred in any action brought as a result of Purchaser's default, unless Purchaser has within thirty (30) days of notice from Seller cured such default or commenced to cure and diligently pursue the curing of any default of such a nature that it cannot be cured within the thirty (30) day period. Upon Purchaser's default, Seller may

14

retain copies of the development and sales material of Purchaser concerning the Project as liquidated damages. . . . .

Contract of Sale ¶ 36.

This liquidated damages clause limits the sole and exclusive remedy of the Seller to costs, fees, and copies of development and sales materials. Therefore it appears that Premier is limited to the remedies provided in Paragraph 36 of the Contract of Sale for any damages relating to these other projects. Therefore, the Court finds that the damages asserted by Premier with regard to properties not yet purchased and/or projects not yet undertaken by Debtor are improper under the terms of the Contract of Sale.

At the hearing in this matter, Goulding testified that the net profits last year for the entire Premier International company were approximately $1.2 million, based upon Premier's control of approximately 7000 "keys" nationwide. Every room that is available to be rented out by Premier is represented by a "key." Premier expected to control 326 keys at the Villas. Goulding testified that the 326 keys at the Villas would provide an expected net profit of $1,190,813 in the first year, which Premier alleged would be a compensable damage. Robert Young ("Young"), testified for Debtor. Young noted that Premier's profit from the Villa this would mean that Premier International would receive approximately as much net profit just from the 326 available keys at the Villas as it does from all of its 7000 keys nationwide. Even if the Court found that Debtor was required to give Premier International the initial Homeowners Association management contract, the Court finds Premier's evidence as to their calculation of damages unpersuasive because it appears that the calculation is speculative and exaggerated.

## II.        Premier's Objections to Debtor's Asset Sales[5]

On March 6, 2006, Premier filed a written objection to all further asset sales until Debtor files a master deed in a form that complies with the Court's First Sales Order and a Conditional Objection to any further asset sales pending Debtor's election to assume or reject the December 18, 2003 Contract of Sale with Premier Holdings of South Carolina, LLC.

First, Premier objected to any further asset sales until Debtor files a master deed in a form that complies with the Court's First Sales Order. Premier asked the Court to require Debtor to reconsider the Master Deed and those documents related thereto. The Master Deed and related documents have already been recorded and previously approved under certain standards and conditions of the First Sales Order. The First Sales Order addressed certain matters between the parties and made an effort to protect certain alleged interests of Premier. It appears from the evidence presented to the Court that there are certain technical corrections that need to be made in the Master Deed documents, as testified to by Debtor's closing attorney at the hearing on this matter, and there may also be some scrivener's errors. But, absent those, a detailed review of the issues raised by the parties indicates that the present provisions of these documents are not unreasonable. Therefore, they may otherwise stand as they have been entered and recorded. Premier's objections relating to the Master Deed documents are overruled.

---

[5] The Court notes that these Objections have already been addressed by the separate Sales Orders of the Court approving Debtor's asset sales.

16

Second, Premier conditionally objected to any further asset sales pending Debtor's election to assume or reject the Contract of Sale with Premier Holdings of South Carolina, LLC. The Court takes under advisement a determination of whether the Contract of Sale is "executory" and whether assumption or rejection by Debtor would be proper pursuant to Premier's Motion to Compel. The Court finds that the issue of assumption or rejection of the Contract of Sale need not be determined prior to Debtor's proposed sales moving forward. Premier's objections to the proposed sales relating to assumption or rejection of the Contract of Sale are overruled by this Court.

The Court notes that the protections afforded to Premier in the First Sales Order entered pursuant to the First Sales Hearing are still in effect. Debtor has included the required "commercial units" language in the recorded Master Deed and has agreed and remains ordered not to transfer any "commercial units." Debtor further agreed to and remains ordered to hold the Net Cash Flow remaining after all approved expenses. Both Premier and Debtor have mutually agreed and remain ordered not to make any future disparaging comments relating to the other either in public or private. Additionally, pursuant to the First Sales Order, Debtor has caused the interim management company for the Homeowners Association to be selected. Such interim management contract must continue to be for a term not exceeding 90 days after the closing of the last unit sales contracts in Building 3, which sale contracts must be approved by this Court in a hearing scheduled for April 4, 2006. The duration of this interim Homeowners Association management contract remains subject to further order of this Court, and termination or shortening thereof shall not subject Debtor to claims for damages as previously ordered.

**III.**     **Premier's Preemptive Objection to Debtor's Rejection of the Contract of Sale**

17

As noted previously herein, the Court takes under advisement the Motion to Compel Assumption or Rejection of the Contract of Sale. The Court finds that this issue does not need to be resolved prior to approval of the sales. At this time, the Court overrules Premier's Preemptive Objection to Debtor's rejection of the Contract of Sale.

**IV.**    **Premier's Conditional Motion to Dismiss for "Bad Faith"**

Premier's Motion/Objection also moved the Court to dismiss Debtor's bankruptcy as a "bad faith" filing pursuant to 11 U.S.C. §1112(b). Premier alleged that Debtor filed its bankruptcy as a mere litigation tactic in a two-party dispute, and cited to various cases supporting their position.

Premier alleged "bad faith" on two grounds. First, Premier attempted to object to Debtor's bankruptcy filing by alleging that Debtor is attempting to "ramrod" its sales through the Court for approval at "below-market" prices. However, throughout the history of the project, Premier of S.C. and the construction lender, NBSC, agreed to, and, in fact, supported and required the pre-sale process used by Debtor in this case. Premier acknowledged at both of the first two sales hearings that it approved of the pre-sale process. The intentions of the project, as entered into prior to construction, were to pre-sell condominiums and assign the contracts of sale to NBSC in order to finance construction. There appears to be a significant economic benefit for the estate that these pre-sales be approved, and it appears that the approval of these sales is in the best interest of all of Debtor's creditors.

Second, Premier asserted that Debtor and Premier entered into a valid, enforceable settlement agreement on the eve of the bankruptcy filing and that Debtor showed "bad faith" by rejecting the alleged settlement agreement and filing its bankruptcy petition. Based upon the

18

evidence in this matter, the Court finds that the evidence associated with certain negotiations between the parties in February, on the eve of the bankruptcy, did not amount to an agreement among the parties. The parties were represented by counsel and the parties themselves, as well as their counsel, disagree on whether any agreement was reached. There was also no signed agreement regarding any such discussions. South Carolina law appears to require a signed agreement. "No agreement between counsel affecting the proceedings in an action shall be binding unless reduced to the form of a consent order or written stipulation signed by counsel and entered in the record, or unless made in open court and noted upon the record." Rule 43(k), SCRCP. See also Farnsworth v. Davis Heating & Air Conditioning, Inc., 2006 WL 538287 (S.C. S.Ct. March 6, 2006). Although, any agreement would have predated this case, the agreement would have certainly effected the Lis Pendens and should have been in writing.

Premier cited to various cases supporting its position that Debtor filed this case in bad faith as a litigation tactic in a two-party dispute. The Court does not disagree with the holdings of those cases, but does not agree with Premier's portrayal of Debtor's situation leading up to the bankruptcy filing or the allegations of a mere two-party dispute. The Court notes that there are numerous other creditors and parties in interest in this dispute, including the secured lenders, NBSC and Coastal Federal, the contractor, the interior furnisher/designer, and the 145 purchasers under the condominium unit sales contracts. The Court also notes that Debtor's motions for approval of sales and assumptions of the contracts of sale are supported by its primary creditors. NBSC, Coastal Federal, Dargan Construction, Sally Stowe Interiors, and Jenkins Hancock & Sides appeared before the Court to voice their support for Debtor.

The Court finds that Debtor filed its Bankruptcy Petition in the face of grave financial difficulty. Due to the Lis Pendens filed by Premier, Debtor was unable to complete the construction and close the sales of its condominium units, its only source of revenue. NBSC deemed itself insecure and declined to authorize advancing the unfunded portion of the construction loan to Debtor. It also appears that NBSC was preparing to foreclose on the condominiums. The bankruptcy petition was filed in order to allow Debtor to continue its business operations by permitting financing to finish the construction of the Villas condominium units and to allow Debtor to sell the condominium units free and clear of all liens, including the Premier Lis Pendens. The bankruptcy filing was aimed at the continuation of the ordinary business affairs of Debtor and it appears to be in the best interest of the primary creditors of the case.

To warrant dismissal of a Debtor's bankruptcy petition in a chapter 11, the movant must show the objective futility of the petition as well as Debtor's subjective bad faith. In re Coleman, 426 F.3d 719 (4th Cir. 2005); Carolin Corporation v. Miller, 886 F.2d 693 (4th Cir. 1989). From the evidence before the Court, there seems to be ample justification for the filing of the Chapter 11 bankruptcy case. The Court finds that the bankruptcy filing was justified under the high standards for dismissal in the early stages of a case in the Fourth Circuit. "Upon consideration, we agree with those courts that require that *both* objective futility and subjective bad faith be shown in order to warrant dismissals for want of good faith in filing. This means that if the only question raised is whether a reorganization is realistically possible, i.e., if there is no question of the petitioner's subjective good faith in filing, threshold dismissal of a petition is not warranted.

In those circumstances the question of ultimate futility is better left to post-petition developments." See Id. at 700-701.

Based upon the foregoing:

It is ORDERED, ADJUDGED, AND DECREED that:

(1)     Premier's Objections to Debtor's proposed sales of assets are and shall be overruled as previously set out in the Court's Second Sales Order and the Court's Third Sales Order.  Debtor's motion to sell is approved;

(2)     Premier's Motion to Compel Assumption or Rejection shall be addressed by separate order;

(3)     Premier's Pre-emptive Objection to Debtor's rejection of the Contract of Sale is hereby overruled, although Premier shall be permitted to raise any objection to the assumption or rejection of the Contract of Sale if and when Debtor should file a motion to assume or reject such contract; and

(4)     Premier's Conditional Motion to Dismiss Debtor's Bankruptcy Case for alleged "Bad Faith" shall be and is hereby denied.

**AND IT IS SO ORDERED.**

UNITED STATES BANKRUPTCY JUDGE

Columbia, South Carolina,
April 3, 2006

21